**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

TROVILLION CONSTRUCTION &
DEVELOPMENT, INC.,

                Plaintiff,

v.                                           Case No. 6:12-cv-914-Orl-37TBS

MID-CONTINENT CASUALTY
COMPANY; and CASA JARDIN
CONDOMINIUM ASSOCIATION, INC.,

                Defendants.

_____

**ORDER**

This cause is before the Court on the following:

1.    Plaintiff's Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 66), filed August 14, 2013;

2.    Mid-Continent Casualty Company's Motion for Summary Judgment and Memorandum of Law (Doc. 67), filed August 14, 2013;

3.    Plaintiff's Response in Opposition to Mid-Continent Casualty Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 76), filed September 13, 2013;

4.    Mid-Continent Casualty Company's Response in Opposition to Trovillion Construction's Motion for Final Summary Judgment (Doc. 77), filed September 13, 2013;

5.    Plaintiff's Reply to Mid-Continent Casualty Company's Response in Opposition to Plaintiff, Trovillion Construction & Development, Inc.'s Motion for Final Summary Judgment (Doc. 82), filed September 27, 2013;

6.    MCC's Amended Reply in Support of Its Motion for Summary Judgment (Doc. 86), filed October 1, 2013; and

7.    Defendant Mid-Continent Casualty Company's Motion to Realign Casa Jardin Condominium Association, Inc. as a Plaintiff and Supporting Memorandum of Law (Doc. 109), filed January 2, 2013.

Upon consideration, the Court finds that Defendant's motion to realign (Doc. 109) is due to be granted, Plaintiff's motion for summary judgment (Doc. 66) is due to be denied, and Defendant's motion for summary judgment (Doc. 67) is due to be granted.

## BACKGROUND

Plaintiff Trovillion Construction & Development, Inc. ("Trovillion") is a general contractor. (Doc. 66, p. 2.) In 2002, Trovillion contracted with Casa Jardin Development Company ("CJDC") to build a fourteen-unit condominium in Winter Park, Florida. (*Id.* at 3; Doc. 67, p. 4.) Construction was to occur in multiple phases and would take several years to complete. (*See* Doc. 66, pp. 3–4.)

At the outset, Trovillion purchased Commercial General Liability[1] ("CGL") insurance from Defendant Mid-Continent Casualty Company ("MCC"). (*Id.* at 2; Doc. 67, p. 4.) MCC's insuring agreements were sold in one-year increments and provided that, if Trovillion were sued for "bodily injury" or "property damage" occurring during an applicable policy period, MCC would defend Trovillion and indemnify it for any sums that

---

[1] CGL policies "are designed to protect an insured against certain losses arising out of business operations." *U.S. Fire. Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007). They have a relatively narrow scope. CGL policies are designed to protect commercial operators from liability for damages arising out of their business operations; they are not designed to guarantee the quality or successful completion of the policyholder's work. *See id.* at 892 (Lewis, J., concurring in result only).

it became legally obligated to pay. (*See* Doc. 66, pp. 2–3.) Beginning in 2003, Trovillion bought a policy each year for the next six years. (*See id.*; Doc. 67, p. 4.) The scope of coverage under all six policies was substantially the same, except that the 2004–2005 policy—the second of the six—was slightly broader than the other five; it did not contain an endorsement present in the other five policies that eliminated the subcontractor exception to the "your work" exclusion, meaning that the 2004–2005 policy covered certain types of damage caused by subcontractors that the remaining five policies did not. (*See* Doc. 66, p. 3.)

In late 2008, Trovillion cancelled the sixth MCC policy and switched its CGL insurance provider to Endurance American Specialty Insurance Company ("Endurance"). (*Id.* at 2; Doc. 77, p. 2.) Trovillion secured a CGL policy from Endurance effective February 2, 2009 through December 18, 2009. (Doc. 67, p. 2.)

In July 2009, CJDC turned over control of the condominium to the resident Board of Directors, which formed the Casa Jardin Condominium Association ("Association"). (*See id.* at 4; Doc. 48-6, ¶ 16.) On October 21, 2009, at the Association's request, Brussel Consulting & Construction Management, Inc. ("Brussel") performed an inspection of the condominium. (Doc. 67-2, p. 3.) The investigation revealed several building code violations and system failures, which Brussel concluded were "causing and [would] continue to cause rapid deterioration of the building envelop, failures of the structural framing systems, damage to interior finishes and continuing problems with organic growth in habitable areas." (*Id.* at 9.)

Based on the Brussel report findings, the Association sued Trovillion and CJDC in state court on April 9, 2010, alleging violations of the building code, breach of statutory

warranties, breach of contract, and deceptive and unfair trade practices. (*See* Doc. 48-6.)

The damages sought by the Association included the cost of rectifying the building code

violations as well as the cost of repairing damage that the violations caused to other

property. (*Id.* at 11.) Trovillion tendered its defense to both MCC and Endurance. (Doc. 66,

p. 5.) Endurance provided a defense under a reservation of rights and retained counsel

to defend Trovillion. (*Id.*) MCC investigated Trovillion's claim under a reservation of rights,

but ultimately denied coverage. (*See* Doc. 66-6; Doc. 48-7.)

In response to MCC's denial, Trovillion filed this declaratory judgment and breach

of contract action against MCC, which MCC removed to this Court. (*See* Docs. 1–2.)

Trovillion sought: (1) a declaration that MCC had a duty to defend and indemnify it in the

Association's suit; and (2) damages flowing from the coverage denial, including attorney's

fees. (Doc. 2, pp. 6–7.) The Association was added as a nominal Defendant and

necessary party in interest. (Docs. 23–24.)

Meanwhile, the Association's state-court litigation progressed with Endurance in

control of Trovillion's defense. On the eve of trial, Trovillion and the Association entered

into a "Settlement Agreement, Assignment, and Covenant not to Execute," which

provided for a $1,800,000 consent judgment to be entered in favor of the Association and

against Trovillion. (*See* Doc. 66, p. 7; Docs. 48-9, 67-9–11.)

Following entry of the consent judgment, Trovillion amended its Complaint in this

case and now seeks: (1) a declaration that MCC is obligated to indemnify Trovillion for

the damages assessed against it in the underlying lawsuit; and (2) recovery of

$1,800,000, the amount of the consent judgment, under a breach-of-contract theory. (*See*

Doc. 48.) Trovillion and MCC have filed cross-motions for summary judgment. (Docs. 66,

67.) Both parties have responded (Docs. 76, 77) and replied (Docs. 82, 86). The matter is now ripe for the Court's adjudication.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant carries its burden by showing that there is an absence of evidence supporting the non-movant's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show a genuine issue for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Which facts are material depends on the underlying substantive law. *Id.* The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

## DISCUSSION

Trovillion brings this declaratory judgment and breach-of-contract action against MCC seeking indemnity from the $1,800,000 consent judgment that was entered against it in state court pursuant to a *Coblentz* agreement.[2] Under Florida law, a party seeking

---

[2] The term "*Coblentz* agreement" refers to a settlement agreement entered into

recovery from an insurer under a *Coblentz* agreement must prove: (1) a wrongful refusal to defend; (2) a duty to indemnify; and (3) that the settlement was objectively reasonable and made in good faith. *See Sinni v. Scottsdale Ins. Co.*, 676 F. Supp. 2d 1319, 1324 (M.D. Fla. 2009) (citing *Chomat v. N. Ins. Co. of N.Y.*, 919 So. 2d 535, 537 (Fla. 3d DCA 2006)).

## I.   Realignment

As a threshold matter, the Association's presence in this action jeopardizes the Court's diversity jurisdiction; Defendant Association is a Florida corporation with its principal place of business in Winter Park, Florida, and Plaintiff Trovillion is a Florida corporation with its principal place of business in Orlando, Florida. (See Doc. 48-6, p. 2.) The parties move to realign the Association as a plaintiff, arguing that the Association is a necessary party to this suit whose interests are aligned with Trovillion's. (Doc. 109, pp. 1–2.) The Court agrees.

The parties' interests in this action were determined by the three-party *Coblentz* agreement into which they entered to resolve the state-court litigation. (*See* Doc. 67-10.) The agreement expressly envisioned that, following resolution of the state-court proceedings, Trovillion, Endurance, and the Association would turn their consolidated efforts toward prosecuting Trovillion's claims against MCC. (*See id.* at 5; Doc. 67-9, p. 5.) To effectuate the agreement, Trovillion: (1) entered into a consent judgment establishing

---

between an insured and a claimant in order to resolve a lawsuit in which the insurer has denied coverage and declined to defend. *See Coblentz v. Am. Sur. Co. of N.Y.*, 416 F.2d 1059, 1063 (5th Cir. 1969). In a traditional *Coblentz* agreement, the insured: (1) enters into a consent judgment establishing its liability and fixing damages; and (2) assigns any cause of action it has against its insurer to the claimant. *See id.*; *Chomat v. N. Ins. Co. of N.Y.*, 919 So. 2d 535, 536–37 (Fla. 3d DCA 2006). In return, the claimant covenants not to execute on the judgment against the insured. *Id.*

its general liability in the state-court litigation and fixing damages at $1,800,000 (Doc. 67-9, p.3); (2) agreed to pay the Association $510,000 (Doc. 67-10, p. 2); and (3) entered into a loan-receipt agreement with Endurance by which Trovillion surrendered control of its claims against MCC along with the right to any recovery in exchange for a $510,000 loan from Endurance to pay the Association, repayable only in the event and to the extent of any recovery against MCC. (Doc. 67-11, p. 5.) Endurance, in turn, agreed: (1) to pay the Association $200,000 (Doc. 67-10, p. 1); (2) to loan Trovillion $510,000 for its payment to the Association (*id.* at 2; Doc. 67-11, p. 5); (3) to split any amount recovered against MCC in excess of $710,000 with the Association (*id.* at 1; Doc. 67-10, p. 2); and (4) to dismiss its federal claim seeking a declaration that it had no duty to defend Trovillion (Doc. 67-10, p. 5). For its part, the Association agreed not to execute the consent judgment and to release Trovillion from liability immediately upon resolution of this case. (*Id.* at 2, 4.) The net effect of the agreement was to fully insulate Trovillion from liability arising out of the state-court action, leaving Endurance to pursue Trovillion's claim against MCC for the benefit of itself and the Association.

Accordingly, the interests of the Association fall squarely in line with those of Trovillion and Endurance and are opposed to those of MCC. Therefore, because "federal courts are required to realign the parties in an action to reflect their interests in the litigation," the parties' motion to realign (Doc. 109) is due to be granted, and the Association is due to be realigned as a Plaintiff. *City of Vestavia Hills v. Gen. Fid. Ins. Co.*, 676 F.3d 1310, 1313 (11th Cir. 2012).

## II.     Duty to Defend

In Florida, an insurer's duty to defend is broader than its duty to indemnify. *See*

*Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So. 2d 810, 813 (Fla. 1st DCA 1985)

(discussing the rationale behind the rule). Specifically,

> [t]he duty to defend depends solely on the allegations in the complaint filed against the insured. The complaint must allege facts which fairly bring the case within coverage even though ultimately there may be no liability on the part of the insured. If the complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit. The duty to defend is separate and apart from the duty to indemnify and the insurer may be required to defend a suit even if the later true facts show there is no coverage. All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured and if the complaint alleges facts which create potential coverage under the policy, the duty to defend is triggered.

*Trizec Props., Inc. v. Biltmore Constr. Co.,* 767 F.2d 810, 811–12 (11th Cir. 1985)

(citations and internal quotation marks omitted) (applying Florida law). Additionally, for an

insurer to deny a defense based solely upon on a policy exclusion, the complaint against

the insured must allege facts that clearly bring the entire case within the applicable

exclusion. *See Baron Oil*, 407 So. 2d at 815.

The CGL policies that MCC issued to Trovillion were "occurrence" policies,

meaning that the insurance covers "bodily injury" or "property damage" that "occurs during

the policy period" and is caused by an "occurrence" that takes place within the coverage

territory. (*See* Doc. 48-1, p. 12.) Thus, coverage under the MCC policies is not triggered

until property damage "occurs." *See Trizec*, 767 F.2d at 812. The Florida Supreme Court

has not yet clarified when property damage "occurs" for coverage purposes, and trial

courts apply varying trigger theories. *See Axis Surplus Ins. Co. v. Contravest Constr. Co.*,

921 F. Supp. 2d 1338, 1346 (M.D. Fla. 2012) (Antoon, J.). Some courts apply the injury-

in-fact trigger, "under which damage 'occurs' at the moment there is actual damage and

the date of discovery is irrelevant." *Id.*; *see also Trizec*, 767 F.2d at 813 ("[I]t is the damage

itself which must occur during the policy period for coverage to be effective."). Others apply variations of the manifestation trigger, under which damage occurs when it is discovered or becomes discoverable. *See, e.g.*, *Essex Builders Grp., Inc. v. Amerisure Ins. Co.*, 485 F. Supp. 2d 1302, 1309 (M.D. Fla. 2006); *Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.*, 227 F. Supp. 2d 1248, 1266 (M.D. Fla. 2012) ("Florida courts follow the general rule that the time of occurrence within the meaning of an 'occurrence' policy is the time at which the injury first manifests itself.") (citation omitted).

Here, the underlying state-court complaint alleges that Trovillion and CJDC were responsible for building code violations and construction defects that were causing ongoing damage to the condominium, including "community-wide water intrusion damages, rotting of the building components, bioorganic growth and propagation, and damages to interior and exterior finishes." (Doc. 48-6, ¶¶ 43–46.) The complaint is silent with respect to the exact date that the construction defects began to physically damage the condominium, but the attached Brussel report indicates that the damage would have begun at some point between the commencement of construction in 2003 and the Brussel firm's inspection on October 21, 2009. (*See* Doc. 67-2, p. 3.) The complaint further alleges that "[t]he defects and deficiencies were not readily discoverable by the Association or its members through reasonable inspection at the time of purchase, and the Association and its members only became aware of the defects and deficiencies through inspections performed by expert consultants." (Doc. 48-6, ¶ 26.)

Based on these allegations, MCC argues that it had no duty to defend. (Doc. 67, pp. 14–16.) Applying a manifestation trigger theory, MCC argues that the Association alleged damages that were revealed only after the expert inspections in 2009, which

occurred well after Trovillion cancelled coverage on October 5, 2008.  (*Id.* at 4 n.2, 14.) Trovillion, on the other hand, advocates for the injury-in-fact trigger theory; it contends that the underlying complaint sufficiently alleged damages of a longstanding nature that, when "fairly read," create the potential for coverage, which is enough to trigger MCC's duty to defend. (Doc. 66, p. 14 (citing *IDC Constr., LLC v. Admiral Ins. Co.*, 339 F. Supp. 2d 1342 (S.D. Fla. 2004)).)

The Court is persuaded by the *Axis Surplus* analysis[3] that the injury-in-fact rule is the most appropriate trigger theory for occurrence policies. *See Axis Surplus*, 921 F. Supp. 2d at 1346–48 (reviewing the divergent lines of cases applying the injury-in-fact trigger and the manifestation trigger under Florida law and concluding that the injury-in-fact trigger is more textually consistent with the CGL policy language and has greater precedential support). Therefore, because the Association's complaint inferentially suggested that physical damage occurred between the commencement of construction

---

[3] Specifically, the court in *Axis Surplus* traced the manifestation lines of cases back to *Travelers Insurance Co. v. C.J. Gayfer's & Co.*, 366 So. 2d 1199, 1200 (Fla. 1st DCA 1979), which reasoned that "[t]he term 'occurrence' is commonly understood to mean the event in which negligence manifests itself in property damage or bodily injury, and it is used in that sense here." *Axis Surplus*, 921 F. Supp. 2d at 1347. Based on this line, several courts have concluded that Florida applies a manifestation trigger theory. *See id.* (collecting cases). Upon closer review, however, *Gayfer's* is one of many "decisions sometimes cited as following the manifestation rule, and which indeed use a form of the word 'manifest' in their analysis, [but] do not actually follow the manifestation rule as opposed to the [injury-in-fact] rule, because they were not concerned with the latent damages where these two rules diverge." *Id.* (quoting *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W. 3d 20, 27 (Tex. 2008)). Rather, these courts distinguish address the lag between the time of an insured's negligent work and the time of the resulting property damage, not the lapse between the time that property damage first occurs and the time that it first becomes discoverable. *Id.* at 1348. Those cases that have addressed "the latent damages where these two rules diverge" have ultimately applied the injury-in-fact trigger theory, and this Court will follow their lead. *See, e.g., Trizec*, 767 F.3d at 813.

and the Brussel firm's inspection of the property, and because MCC's policies were in effect during this timeframe, MCC had a duty to defend Trovillion in the underlying action. *See id.* at 1349 (reaching the same conclusion based on a factually similar complaint).

MCC alternatively argues that the Association's complaint alleged that Trovillion was engaged in an undisclosed joint-venture with CJDC, which relieved MCC of its duty to defend. (Doc. 67, pp. 12–14.) Specifically, CJDC was not listed as a named insured in the declarations of any MCC policy, and all policies provided that "[n]o person or organization is an insured with respect to the conduct of any current or past . . . joint venture . . . that is not shown as a Named Insured in the Declarations." (*E.g.*, Doc. 67-12, p. 8.) Thus, if Trovillion's liability arose out of a joint-venture with CJDC, it would not be considered an "insured" for purposes of the MCC policies.

Under Florida law,

> A joint venture, like a partnership, may be created by express or implied contract, and the contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control.

*Williams v. Obstfeld*, 314 F.3d 1270, 1275–76 (11th Cir. 2002). Significantly, "Florida courts have interpreted these requirements to preclude a finding that a partnership or joint venture exists where any factor is missing." [4] *Id.* at 1276.

MCC's joint venture argument fails because the Association's complaint lacks any indication that CJDC and MCC shared profits and losses. (*See* Doc. 48-6.) MCC argues

---

[4] To the extent that MCC relies on *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 211 (11th Cir. 1991) for the proposition that the absence of one element does not preclude a finding that businesses are engaged in a joint venture, *Fulcher's* is inapposite; it does not apply Florida law, which controls this case. *See id.* at 211 n.3.

that Trovillion and CJDC had a business relationship "where one party supplies labor and skill, the other supplies capital, and both agree to share in the profits of the venture." (Doc. 86, p. 3 (quoting *Williams*, 314 F.3d at 1270) (internal quotation marks omitted).) In such a situation, "Florida courts have concluded an agreement to share losses exists as a matter of law since in the event of a loss, the party supplying the knowhow would have exercised his skill in vain and the party supplying the capital investment would have suffered a diminishment thereof." *Williams*, 314 F.3d at 1270 (citation and internal quotation marks omitted). If such an agreement existed between Trovillion and CJDC, it was not apparent from the face of the Association's complaint. While the Association alleged that the Trovillion and CJDC were jointly "responsible for the design, development, construction and sale of the Casa Jardin Condominium community" (Doc. 48-6, ¶ 1), it never addressed any financing or capitalization agreement between the two entities. To the contrary, the Association's complaint specifically states that "[t]he precise roles, actions and omissions undertaken by each person and entity in the [condominium community's] design, construction, development, sale and attempted repairs are currently unknown to the Association." (*Id.* ¶ 22.) In short, the Association's complaint alleges an ambiguous relationship between Trovillion and CJDC, and ambiguities are resolved in favor of the insured. *See Trizec*, 767 F.2d at 812 (citing *Tropical Park, Inc. v. U.S. Fid. & Guar. Co.*, 357 So. 2d 253, 256 (Fla. 3d DCA 1978)). As such, the business relationship alleged to exist between Trovillion and CJDC did not relieve MCC of its obligation to defend Trovillion in the underlying lawsuit.

## III.    Duty to Indemnify

Having determined that MCC owed Trovillion a duty to defend based upon alleged

coverage, the Court now turns to whether MCC has a duty to indemnify Trovillion based upon actual coverage. "Florida law clearly states that liability of an insurer depends upon whether the insured's claim is within the coverage of the policy. This remains true even when the insurer has unjustifiably failed to defend its insured in the underlying action." *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1149 (11th Cir. 1994). "A determination of coverage, therefore, is a condition precedent to any recovery against an insurer." *Id.* (citing *Steil v. Fla. Physicians' Ins. Reciprocal*, 448 So. 2d 589, 592 (Fla. 2d DCA 1984)).

The duty to indemnify is narrower than the duty to defend and depends upon actual coverage "measured by the facts as they unfold at trial or are inherent in the settlement agreement." *IDC Constr.*, 339 F. Supp. 2d at 1349 (citations and internal quotation marks omitted); *see also State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1077 n.3 (Fla. 1998). Facts "inherent in" a settlement agreement are those "facts extant at the time the settlement was reached." *See Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc.*, 344 F. Supp. 2d 1358, 1366 (M.D. Fla. 2004).

Significantly, Trovillion constructed the condominium exclusively through the use of subcontractors. (*See* Doc. 76, p. 12; Doc. 48-4.) In determining the scope of coverage under standard-form CGL policies, "the Florida Supreme Court has drawn a distinction between 'a claim for the cost of repairing the subcontractor's defective work,' which is not covered under a CGL policy, and 'a claim for repairing the structural damage to the completed [project] caused by the subcontractor's defective work,' which is covered. *Amerisure Mut. Ins. Co. v. Auchter Co.*, 673 F.3d 1294, 1306 (11th Cir. 2012) (quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007)). However, an insurer is only liable for structural damage caused by a subcontractor's defective work if the

damage occurs during the policy period of a CGL policy that includes the "subcontractor exception" to the "your work" exclusion. *See J.S.U.B.*, 979 So. 2d at 891 (observing that an insurer can exclude coverage for damage arising out of a subcontractor's defective work by eliminating the subcontractor exception to the work exclusion).

Of the six CGL policies MCC issued in this case, only the second contained the subcontractor exception. (*See* Doc. 66, p. 3.) The remaining five policies contained the CG2294 endorsement, which eliminated the exception. (*Id.*) Therefore, the MCC policies cover Trovillion's subcontractors' defective work only if the work caused physical damage to the condominium, and only then if the damage began between April 15, 2004, and April 15, 2005—the effective dates of the second MCC policy. (*See* Doc. 48-2.) Dating damages, therefore, is crucial to Trovillion's effort to show actual coverage.

MCC argues that Trovillion has failed to produce evidence indicating that property damage occurred during the second policy period and therefore cannot prove coverage, an essential element of its case. (*See* Doc. 67, pp. 16–17.) Trovillion counters that the DART report, an expert report written on April 14, 2005, indicates that water damage had manifested in one of the fourteen units by April 5, 2005, and creates a genuine issue of material fact. (*See* Doc. 76, p. 11.) However, the DART report contains no evaluation of when construction defects began to damage the unit at issue, and as addressed above, the manifestation of damages does not trigger coverage; it only indicates an the injury-in-fact occurred at some indeterminate prior date. (*See id.*; Doc. 67-31). The Court is not persuaded that the scintilla of evidence found in the DART report creates a genuine issue of material fact precluding summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

More importantly, MCC argues that even if Trovillion could demonstrate that some covered property damage occurred during the applicable policy periods, its inability to allocate the amount of the consent judgment between covered and uncovered damages is fatal to its indemnification claim. *See Keller Indus., Inc. v. Emp'rs Mut. Liab. Ins. Co. of Wis.*, 429 So. 2d 779, 780 (Fla. 3d DCA 1983). The Court agrees.

The express terms of the settlement agreement indicate that the consent judgment subjects Trovillion to liability beyond the scope of the MCC policies; the damages encompassed within it were intended not to be representative of MCC's coverage, but rather to be "representative of the legal exposure faced by Trovillion" in the underlying lawsuit. (Doc. 67-10, p. 1.) Trovillion's legal exposure included, for example, liability for the cost of rectifying building code violations[5] (*see* Doc. 48-6, p. 7), which falls within the uncovered category of "claim[s] for the cost of repairing [a] subcontractor's defective work." *Auchter*, 673 F.3d at 1306. These violations were not hypothetical; the Brussel included evidence of specific code violations. (*See* Doc. 67-2, pp. 4–5.) Trovillion was also exposed to liability for "community-wide water intrusion damages" (*id.* ¶ 45), which necessarily would have included damage to those units constructed after April 15, 2005, the expiration of the policy period that included the subcontractor exception. (*See* Doc. 66, ¶¶ 2, 7–9.) Thus, the damages in the consent judgment require both temporal and categorical allocation, but the settlement agreement and consent judgment are completely unallocated. (*See* Docs. 67-9–11.) Florida law requires Trovillion, the party seeking recovery, to allocate the settlement amount between covered and uncovered

---

[5] These costs were separate from the additionally claimed costs of repairing damages arising out of those building code violations, which are at least potentially covered. (*See* Doc. 48-6, p. 7.)

claims. *See Keller*, 429 So. 2d at 780; *Am. Cas. Co. of Reading Pa. v. Health Care Indem., Inc.*, 613 F. Supp. 2d 1310, 1320 (M.D. Fla. 2009). Inability to allocate precludes recovery. *See Am. Cas. Co.* at 1320–21; *Keller*, 429 So. 2d at 780; *Jones v. Holiday Inns, Inc.*, 407 So. 2d 1032, 1034 (Fla. 1st DCA 1981).

Trovillion presents no evidence indicating that it could apportion damages. (*See* Doc. 76, p. 15.) Instead, Trovillion argues that allocation is unnecessary because: (1) an insurer's wrongful refusal to defend obligates the insurer to pay the entire amount of the underlying judgment entered against it, regardless of actual coverage; and (2) even if allocation were required, MCC is estopped from raising an allocation defense because it failed to disclose the existence of the first three policies prior to the underlying settlement and did not initially deny coverage based on the exclusion of the subcontractor exception. (*Id.*)

Trovillion's first argument misstates Florida law. As addressed above, actual coverage is required for an insured to recover against an insurer, even following a wrongful refusal to defend. *Spencer*, 39 F.3d at 1149. Further, Trovillion's reliance on cases stating that "[i]f the insurer breaches its duty to defend, it . . . becomes liable for all damages naturally flowing from the breach," is misplaced. *Carrousel Concessions, Inc. v. Fla. Ins. Guar. Ass'n*, 483 So. 2d 513, 516 (Fla. 3d DCA 1986); *see also MCO Envtl., Inc. v. Agric. Excess & Surplus Ins. Co.*, 689 So. 2d 1114, 1116 (Fla. 3d DCA 1997) ("The damages incurred by the insured in settling or litigating the case are not limited solely to attorney's fees because the insurer becomes liable for all damages that flow naturally from the breach."). These cases merely hold that, where an insurer undertakes the defense of an insured, but does so inadequately, the insurer is in breach and becomes

liable for all associated "collateral" damages, such as the cost of hiring alternative counsel. *See MCO*, 689 So. 2d at 1116. These cases do not support the position that a wrongful refusal to defend negates an insured's burden of proving coverage.

Second, "as a general principle, the doctrines of waiver and estoppel are not available to extend the coverage of an insurance policy or to create a primary liability." *Am. States Ins. Co. v. McGuire*, 510 So. 2d 1227, 1229 (Fla. 1st DCA 1987). However, waiver and estoppel are available to preclude coverage defenses under in the rare event that "circumstances indicate the insurer's conduct induced the insured to rely on that conduct to his detriment." *Id.* at 1229. The common thread in those rare situations is the insurer's decision to rely on a previously un-asserted coverage defense at an "advanced stage of litigation" and after "dilatory tactics." *See Principal Life Ins. Co. v. Alvarez*, No. 11–21956–CIV, 2011 WL 4102327 at *6–7 (S.D. Fla. Sept. 14, 2011) (collecting cases). By contrast, here Trovillion has not presented any evidence of dilatory tactics on MCC's part; to the contrary, MCC has asserted its intent to rely on all applicable policy exclusions and endorsements, including the subcontractor exclusion, from its first Answer. (*See* Doc. 27, pp. 5–6.) Moreover, from its initial denial letter, MCC "reserve[d] its rights not to indemnify to the extent the claim made does not allege . . . property damage during the policy period" or to the extent that "any exclusion applies." (Doc. 48-7, p. 7.) Accordingly, because the circumstances of this case do not indicate that MCC changed its coverage position late in this litigation or induced Trovillion to take any detrimental position, equitable preclusion of coverage defenses is unwarranted.

Accordingly, Trovillion is not relieved of its duty to apportion damages, and its failure to make any effort to do so or to produce evidence suggesting it is capable of doing

so is fatal to its indemnification claim. *See, e.g.*, *Keller*, 429 So. 2d at 780. For that reason, and because Trovillion has failed to produce more than a scintilla of evidence suggesting that non-excluded property damage occurred at the condominium community during the MCC policy periods, MCC's motion for summary judgment is due to be granted, and Trovillion's motion for summary judgment is due to be denied.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.    Defendant Mid-Continent Casualty Company's Motion to Realign Casa Jardin Condominium Association, Inc. as a Plaintiff and Supporting Memorandum of Law (Doc. 109) is **GRANTED**. Defendant Casa Jardin Condominium Association, Inc. is **REALIGNED** as a party plaintiff.

2.    Plaintiff's Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 66) is **DENIED**.

3.    Mid-Continent Casualty Company's Motion for Summary Judgment and Memorandum of Law (Doc. 67) is **GRANTED**.

4.    The Clerk is **DIRECTED** to enter judgment in favor of Defendant Mid-Continent Casualty Company and against Plaintiffs Trovillion Construction & Development, Inc. and Casa Jardin Development Corporation. Defendant is awarded costs.

5.    The Clerk is further **DIRECTED** to close this case. All pending motions are **DENIED AS MOOT** and all existing deadlines are **VACATED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on January 17, 2014.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record